783 F.2d 319
 20 Fed. R. Evid. Serv. 49
 Mary C. FIACCO, Plaintiff-Appellee-Cross-Appellant,
v.
CITY OF RENSSELAER, NEW YORK, Police Chief James Stark,
Police Officer Edward Meyer, and Police Officer
Kevin Harrington,
Defendants-Appellants-Cross-Appellees.
 Nos. 113, 208, Docket 85-7234, 85-7266.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 26, 1985.
Decided Feb. 11, 1986.
 
 Robert W. Redmond, Troy, N.Y., for plaintiff-appellee-cross-appellant.
 Gregory S. Mills, Albany, N.Y. (Terence P. O'Connor, Carter, Conboy, Bardwell, Case & Blackmore, Albany, N.Y., on the brief), for defendants-appellants-cross-appellees.
 Before FEINBERG, Chief Judge, KEARSE and CARDAMONE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants City of Rensselaer, New York (the "City"), and its police chief James Stark (sometimes collectively the "City defendants"), and City police officers Edward Meyer and Kevin Harrington (collectively the "Officers") appeal from a final judgment of the United States District Court for the Northern District of New York, following a jury trial before Virgil Pittman, Judge, in this action brought under 42 U.S.C. Sec. 1983 (1982). Plaintiff Mary C. Fiacco was awarded $25,000 in compensatory damages for the deprivation of her constitutional rights, plus $850 in compensatory damages on state law claims for injuries caused by defendants' negligence. The jury had returned a verdict awarding Fiacco $75,000 as damages for deprivation of her constitutional rights; it had awarded $1,000 as damages resulting from defendants' negligence but had found Fiacco contributorily negligent to the extent of 15%. After trial, the district court entered an order granting defendants a new trial on the issue of damages unless Fiacco agreed to a remittitur in the amount of $50,000 on her Sec. 1983 claim. Fiacco agreed to the remittitur. On this appeal, defendants contend chiefly (1) that the court should have directed a verdict in their favor on Fiacco's Sec. 1983 claim because there was insufficient evidence of (a) any violation by the Officers of Fiacco's constitutional rights or (b) any policy of the City upon which municipal liability under Sec. 1983 could be premised; (2) that the court erred in admitting against the City defendants evidence of unadjudicated claims of brutality by City policemen; and (3) that the court should have granted defendants' posttrial motion for a new trial because the jury's liability verdicts were inconsistent and against the weight of the evidence and its verdicts on damages were inconsistent. Fiacco cross-appeals, contending that the order leading to the remittitur violated her Seventh Amendment right to a jury trial and was in any event unwarranted.
 
 
 2
 For the reasons given below, we reject defendants' challenges to the judgment against them, and we dismiss Fiacco's cross-appeal.
 
 I. BACKGROUND
 
 3
 In the early morning hours of April 4, 1981, Fiacco was arrested by Meyer and Harrington on charges of disorderly conduct and taken to the police station. Shortly after her arrest, Fiacco suffered, inter alia, injuries to her arms and legs. Fiacco brought the present Sec. 1983 action against the City defendants and the Officers, alleging violation of her federal constitutional rights and asserting pendent state law claims.
 
 
 4
 The complaint alleged that the Officers had used excessive force in taking Fiacco to the police station, in violation of her rights under the Fifth and Fourteenth Amendments to the Constitution. As pendent state law claims, Fiacco alleged that the Officers had maliciously and wantonly assaulted her, negligently injured her, and negligently failed to provide her with prompt medical attention for her injuries.
 
 
 5
 The complaint alleged that the City defendants had violated Fiacco's constitutional rights principally by negligently failing, on a continuing basis, to instruct, supervise, control, and discipline the Officers with respect to the use of unreasonable and excessive force during the making of arrests. Fiacco made the same assertions as a pendent state law claim against the City defendants, and added the assertion that they had negligently failed to instruct and supervise officers in the provision of medical services for those injured during an arrest.
 
 
 6
 A. The Evidence and Verdict Against the Officers
 
 
 7
 The case was tried to the jury in two parts: the first focusing on the allegations against the Officers and the second focusing on the allegations against the City defendants. At the first phase of trial, two substantially differing versions of the events were presented.
 
 1. Fiacco's Version of the Events
 
 8
 According to Fiacco's testimony at trial, she had ended a night of heavy drinking by falling asleep on the front lawn of a home in Rensselaer. She was awakened by Meyer and Harrington, who had placed her in handcuffs and who proceeded, without any verbal or physical provocation on her part, to arrest her for disorderly conduct. Fiacco was placed in a police car and taken to the Rensselaer police station. As she attempted to exit the police car upon their arrival, Meyer poked her and she fell to the ground. Meyer then kicked her in the thighs and arm and, gripping the handcuffs, dragged her along the ground. Meyer subsequently lost his grip on the handcuffs, and Fiacco attempted to run away in order to avoid being hurt further, but she was shoved from behind and fell face down on the ground. Meyer then called Fiacco a "little bitch," added that she was "just like the rest of the Fiaccos," kicked her in the back and legs, and punched her, after which she was pulled, picked up, and taken into the police station. Harrington was present during the above treatment of Fiacco by Meyer and did nothing to prevent or terminate it. After she was taken into the police station, Fiacco was booked on charges of disorderly conduct, resisting arrest, and attempting to escape, and was locked in a cell. Fiacco testified that once she was inside the police station, she made no attempt to flee and never assaulted any police officials.
 
 
 9
 Fiacco testified that while at the police station she complained that the handcuffs were too tight and were hurting her hands, but that nothing was done to loosen them. She complained as well of pain in her legs, arms, and chin, but no medical attention was given her. She also noticed that her blouse was open and her breast exposed. She remained in that condition until she was taken to the Rensselaer County Jail.
 
 
 10
 Phyllis Collins, a correctional officer at the county jail testified that after Fiacco's arrival at that jail she fixed Fiacco's blouse so that it covered her. She noticed that there were scratches and bruises on Fiacco's face and arms. Collins was present when Fiacco's handcuffs were removed, and she testified that there was difficulty in removing them because they were embedded in Fiacco's wrists, and that Fiacco's hands were blue. Fiacco testified that after her handcuffs were removed, her hands were numb and she could not move the middle finger of her left hand.
 
 
 11
 Fiacco was eventually taken to a hospital emergency room where her elbows were cleaned, x-rays taken, and her left arm placed in a brace from the wrist down. Surgery was eventually performed to repair the tendon in Fiacco's finger. The doctor who performed the surgery testified that events such as those described above could have been the cause of Fiacco's injury.
 
 2. The Officers' Version of the Events
 
 12
 Meyer and Harrington offered a different account of the events surrounding Fiacco's arrest. Meyer testified that upon receiving a radio dispatch that a woman was lying unconscious in front of a certain address, he proceeded to the site, found Fiacco there, and tried to revive her. Both officers testified that when Harrington arrived at the scene a few seconds later he radioed for an ambulance, but that either before or as it arrived, Fiacco regained consciousness, began to berate the Officers, kicked Meyer in the shoulder, and slapped Harrington in the face. Fiacco refused to get into the ambulance, and Harrington and Meyer arrested her for disorderly conduct. Fiacco was then handcuffed and taken to the police station.
 
 
 13
 Meyer testified that upon their arrival at the police station, Fiacco began screaming and spitting at Harrington and refused to get out of the car, forcing the officers to carry her from the car into the station; she continued to scream and swear at them. Harrington testified that once inside the station, Fiacco's handcuffs were taken off and she was told to wait on a bench while Harrington filled out the arrest report. Within minutes, however, Fiacco ran toward the entrance of the station where she was caught by the Officers, who returned her to the bench. Fiacco again jumped up and ran, this time exiting the building, pursued by Harrington and desk officer Alfred Syvertsen. Fiacco stumbled to the ground in the station parking lot, and Harrington and Syvertsen brought her back into the building and handcuffed her to a pipe. The Officers then noticed that Fiacco had scraped her arms and that her blouse had loosened, exposing part of her breast. Harrington testified that the blouse was fixed and that Fiacco was offered medical assistance but declined it.
 
 
 14
 Shortly thereafter, the police department matron arrived in response to Syvertsen's call. Fiacco verbally abused the matron and attempted to kick her while they waited for a judge to arrive for Fiacco's arraignment. Throughout this period, Fiacco never requested medical attention or complained about her treatment.
 
 
 15
 3. The Liability Verdict Against the Officers
 
 
 16
 At the close of the evidence as to the events leading to Fiacco's injuries, the Officers moved for a directed verdict in their favor on the ground of insufficiency of the evidence. This motion was denied, and the jury was asked to answer special interrogatories with respect to the liability of each of the Officers. In response to these questions, the jury found that each Officer had (1) deprived Fiacco of her federal constitutional rights, (2) negligently injured her, in violation of state law, and (3) negligently failed to provide her with medical attention, in violation of state law. The jury found that neither Officer had assaulted Fiacco maliciously and wantonly in violation of state law. As to each of the claims of negligence sustained by the jury, the jury found that Fiacco had negligently contributed to her own injuries.
 
 C. The Verdict Against the City Defendants
 
 17
 Following the return of the jury's special verdict with respect to the liability of the Officers, evidence was presented with respect to Fiacco's claims against the City and Stark. In an attempt to show, as required by Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), that her injury had been caused by a custom or policy of the City, Fiacco introduced evidence as to the City's official procedures for handling claims of police brutality and, over defendants' objections, evidence as to claims of such brutality lodged by third parties against the City during the five-year period preceding Fiacco's arrest. The latter evidence, described in greater detail in part III.B.2. below, consisted principally of notices of claims that had been filed against the City alleging police brutality, the testimony of several of the claimants, and the testimony of police chief Stark with respect to his handling of these complaints. Fiacco argued, inter alia, that the handling of these claims and complaints by the City defendants demonstrated a policy of negligent supervision that rose to the level of deliberate indifference to the use by City police officers of excessive force in violation of constitutional rights.
 
 
 18
 The City defendants introduced evidence as to their training of police officers, their investigation of complaints received prior to the events involving Fiacco, and the discharge of three officers from the police force because of their misconduct. In addition, the City offered expert testimony to the effect that its policies of supervision and discipline were in accordance with acceptable police practices.
 
 
 19
 At the conclusion of the proof with respect to Fiacco's claims against the City and Stark, the City defendants moved for a directed verdict in their favor. The court granted the motion in part. As to the Sec. 1983 claim, the court ruled that there was insufficient evidence to support Fiacco's claim that the City defendants had a policy of inadequate training of police officers; further, it ruled that because none of the third-party claims had yet been adjudicated in favor of the complainants, there was insufficient evidence to support the contention that the City defendants had a policy of failing to discipline police officers. As to the state law claims, the court ruled that there was insufficient evidence to support the claim that the City defendants had negligently failed to instruct or supervise the Officers with regard to the provision of medical attention. In sum, the court ruled that only two claims against the City defendants would be submitted to the jury: that part of the Sec. 1983 claim that alleged that Fiacco's injuries resulted from a municipal policy of nonsupervision of the Officers, and the state law claim of negligent supervision of the Officers.
 
 
 20
 Accordingly, the jury was asked to answer, as to each of the City defendants, two interrogatories: (1) whether those defendants
 
 
 21
 [e]ngaged in a course of conduct or had a policy of deliberate indifference to the supervision of the defendant police officers which proximately resulted in the deprivation of ... Fiacco's right to wit: not to be punished or not to have excessive force used against her during her arrest or detention without due process of law in violation of her constitutional right under the 5th and 14th Amendments and pursuant to Title 42 Section 1983,
 
 
 22
 and (2) whether the City defendants "[n]egligently failed to supervise [the Officers] which negligent supervision was a proximate cause of the injuries sustained by ... Fiacco." As to both Stark and the City, the jury answered each interrogatory in the affirmative.
 
 E. The Damages Verdict and the Remittitur
 
 23
 The jury also answered special interrogatories as to damages. It awarded Fiacco $75,000 in compensatory damages for the deprivation of her constitutional rights and $1,000 in compensatory damages for injuries caused by defendants' negligence. The jury specified the extent to which it found the negligence of each party contributed to Fiacco's injuries, finding that Fiacco had been contributorily negligent to the extent of 15%. A judgment was entered accordingly.
 
 
 24
 Following the trial and prior to the entry of this judgment, defendants had moved for a new trial pursuant to Fed.R.Civ.P. 59 on the grounds that the liability verdicts were contrary to law and against the weight of the evidence, and that the amount of the verdict on the Sec. 1983 claim was excessive. After the initial judgment was entered, the court granted defendants' motion in part. It refused to disturb the liability verdicts but found that the amount awarded on the Sec. 1983 claim was "grossly excessive and shock[ed] the judicial conscience," and it ordered a new trial on the issue of damages unless Fiacco agreed to a remittitur in the amount of $50,000. Fiacco agreed to the remittitur, thereby reducing the award on her constitutional claim to $25,000.
 
 
 25
 While the record before us is unclear as to whether a new judgment was ever entered reflecting this lower award, the parties have proceeded as if such a judgment was entered. We will proceed on the assumption that the new judgment was entered or that one may be entered nunc pro tunc following the issuance of our mandate.
 
 F. The Parties' Contentions on Appeal
 
 26
 On this appeal, defendants have challenged the judgment against them only to the extent that it holds them liable to Fiacco for damages on her Sec. 1983 claim; no error has been asserted with respect to the claims for negligence and negligent supervision.
 
 
 27
 As to the Sec. 1983 claim, defendants seek entry of judgment in their favor chiefly on the grounds that (1) the jury's answers to the special interrogatories established that the Officers had not violated any of Fiacco's federal constitutional rights but only her state law rights; (2) a pattern of negligent supervision of municipal employees, even if proven, is insufficient as a matter of law to establish the existence of the "policy" that is prerequisite to the imposition of municipal liability under Sec. 1983; and (3) the evidence was insufficient to establish that the City had a custom or policy of negligent supervision amounting to a deliberate indifference to constitutional rights. Defendants have not argued that, if the evidence was sufficient to prove the City's deliberate indifference to constitutional rights, there was any insufficiency in the evidence that that policy caused the deprivation of Fiacco's constitutional rights; nor have they challenged in any respect the interrogatories put to the jury or the trial court's instructions to the jury.
 
 
 28
 Defendants also contend that, if not entitled to judgment as a matter of law, they should at least have been granted a new trial on the grounds that the admission of evidence as to third-party claims against the City was unduly prejudicial and that the jury's award of $75,000 in damages on the Sec. 1983 claim, in light of its award of only $1,000 on the negligence claims, was inconsistent and excessive.
 
 
 29
 Fiacco has cross-appealed, contending that the conditional order of remittitur violated her Seventh Amendment right to a jury trial and that, in any event, given the weight of the evidence, the order was an abuse of discretion. She seeks reinstatement of the jury's award to her of $75,000 for the violation of her constitutional rights.
 
 
 30
 For the reasons below, we conclude that the trial court properly denied the motions for a directed verdict on the Sec. 1983 claim and properly denied the motion for a new trial on grounds other than the excessiveness of the damage award. We also conclude that Fiacco, having accepted the remittitur, is precluded from challenging on appeal the amount finally awarded to her.
 
 II. THE LIABILITY OF THE OFFICERS
 
 31
 The Officers' principal contention on this appeal is that the verdict of the jury finding them liable to Fiacco for violation of her constitutional rights must be set aside because it is inconsistent with its verdict that they did not maliciously and wantonly assault Fiacco in violation of state law. They argue that the latter finding requires the inference that the jury adopted the Officers' version of the events and that the jury must have found that Fiacco caused her own injuries by stumbling to the ground in an attempted escape. We find no merit in this contention.
 
 
 32
 When a claim is made that a jury's answers to special interrogatories are inconsistent, our responsibility as a reviewing court is to adopt a view of the case, if there is one, that resolves any seeming inconsistency. See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."); Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 748 (2d Cir.1984). Bearing in mind that the jury was entitled to believe parts and disbelieve parts of the testimony of any given witness, we have little difficulty in concluding that there is a view of the case that adequately explains the jury's answers to all of the questions as to the Officers' liability.
 
 
 33
 The first interrogatories asked whether either of the Officers (1) "[d]eprived ... Fiacco of her Constitutional rights in the federal claim pursuant to Title 42, Section 1983"; or (2) "[m]aliciously and wantonmly [sic ] assaulted ... Fiaaco [sic ] under the laws of the State of New York." The differing language of these interrogatories suggests a rational basis on which the jury may have answered the first in the affirmative and the second in the negative. The second interrogatory required, for an affirmative answer, that the jury find that any assault on Fiacco was malicious. No such language was included in the first interrogatory, and the instructions given to the jury with respect to the Sec. 1983 claim made clear that a finding of malice was not a prerequisite to a verdict in favor of Fiacco on that claim. The jury was instructed that although a police officer has the right to use such force as is necessary under the circumstances to effect a lawful arrest, he is not entitled to use force that is unreasonable, unnecessary, or violent; it was instructed that if it found that Fiacco had proven by a preponderance of the evidence that either of the Officers had committed the acts she alleged and that the force used was excessive, it was to find in favor of Fiacco unless it found that the defendants had established a defense of good faith. As to the latter issue, the court instructed the jury that it could not find that defense established if it concluded that the Officer in question either (a) maliciously intended to deprive Fiacco of her constitutional rights or (b) knew or reasonably should have known that his actions would violate her clearly established constitutional rights.
 
 
 34
 Within the framework of these instructions and the language of the interrogatories, the jury could have found that the Officers had used excessive force against Fiacco in violation of her constitutional rights, and that they should have known that they were violating those rights, but that their acts were not malicious. Viewed in this light, the jury's answers to the interrogatories finding the Officers liable to Fiacco for violation of her constitutional rights but not for a malicious assault are not inconsistent. Accordingly, we see no basis on which to disturb the jury's liability verdict against the Officers on the Sec. 1983 claim.
 
 III. THE LIABILITY OF THE CITY DEFENDANTS
 
 35
 The City defendants make several challenges to the liability verdict against them on the Sec. 1983 claim. They argue that a policy of negligent supervision, even if established, is insufficient as a matter of law to sustain a judgment against a municipality under Sec. 1983; that the evidence was, in any event, insufficient to establish that the City had such a policy; and that the trial court erred in allowing Fiacco to present evidence of unadjudicated claims by third persons of police brutality. We conclude that none of these arguments has merit.
 
 
 36
 A. The Legal Sufficiency of a Policy of Deliberate Indifference
 
 
 37
 In support of their argument that they were entitled to judgment as a matter of law, the City defendants make essentially two arguments. First, pointing to the ruling in Monell, 436 U.S. at 694, 98 S.Ct. at 2037, precluding the imposition of Sec. 1983 liability on a city for the act of a lower echelon employee in the absence of proof of a municipal "policy" that caused the injury, and to the observation in the Supreme Court's recent decision in City of Oklahoma City v. Tuttle, --- U.S. ----, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), that "the word 'policy' generally implies a course of action consciously chosen from among various alternatives," id., 105 S.Ct. at 2436 (footnote omitted), they argue that it defies logic and common sense to suggest that a municipality can intentionally pursue a course of negligent supervision since negligence is by definition unintentional. Second, they rely on a footnote in the plurality opinion of Tuttle to argue that a policy that is not itself unconstitutional can never provide the basis for Sec. 1983 liability against a municipality. We find neither argument persuasive.
 
 
 38
 First, Fiacco's theory is not that the City intended to engage in unintentional conduct. Rather it is that the City was knowingly and deliberately indifferent to the possibility that its police officers were wont to use excessive force and that this indifference was demonstrated by the failure of the City defendants to exercise reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force. We see no logical flaw in such a hypothesis, and we reject the notion advanced by the City defendants that a municipality may not be held liable under Sec. 1983 on the basis of a policy of deliberate indifference to the constitutional rights of persons within its domain.
 
 
 39
 Nor are we persuaded by the City defendants' suggestion that a municipal policy that is not itself unconstitutional but that merely permits or tolerates unconstitutional acts by city employees cannot be the basis for municipal liability under Sec. 1983. For this argument the City defendants rely on a footnote in the plurality opinion in Tuttle, in which four Justices "express[ed] no opinion on whether a policy that itself is not unconstitutional, such as the general 'inadequate training' alleged here, can ever meet the 'policy' requirement of Monell." Id. at 2436 n. 7. Notwithstanding this reservation of view, we think the text of the plurality opinion implies that a policy that is not itself unconstitutional may provide the basis for municipal liability. The question resolved in Tuttle was whether the existence of a policy could be inferred solely from evidence of the occurrence of a single incident, and the Court held that more evidence was required. In reaching this conclusion, the plurality opinion noted the plaintiff's contention that there was in the record additional evidence of an official policy of inadequate training but stated that "unfortunately for [plaintiff]," the court had instructed the jury that it could infer the existence of such a policy solely from evidence of the occurrence of the single incident, without any additional evidence. Id. at 2435. The implication of the word "unfortunately" would seem to be that if the jury had not been allowed to infer the existence of the alleged policy--itself not unconstitutional--solely from the occurrence of the single incident, the four Justices who joined this opinion would have upheld the judgment in favor of the plaintiff. Further, in emphasizing that proof of the occurrence of a single incident is not sufficient to establish the existence of an official policy, the plurality opinion went on to state that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish ... the requisite fault on the part of the municipality...." Id. at 2436 (footnote 7 omitted). The concurring opinion in Tuttle indicates that three other Justices would have upheld the judgment for the plaintiff if it had been clear that the jury's finding that there was a policy of inadequate training was based at least in part on the other evidence and not just on the evidence of the occurrence of the single incident there at issue. See id. at 2438 (Brennan, J., concurring). Thus, notwithstanding the plurality's reservation, it is difficult to conclude that the Court would rule that, as a matter of law, a policy that is not itself unconstitutional may not be a premise for municipal liability under Sec. 1983.
 
 
 40
 Nor do we think there is a sound basis for a rule of law that would preclude the premising of municipal liability under Sec. 1983 on any policy that is not itself unconstitutional. A municipality that has the responsibility to keep order and to protect the rights of those within its boundaries to be free from physical violence gives its policemen considerable power to subdue persons who would violate those rights. It cannot responsibly condone police officers' use of that power in a way that is itself lawless. It should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating. A principle that would give a municipality immunity from Sec. 1983 liability for injury caused by its deliberate indifference to its police officers' use of excessive force in violation of constitutional principles would foster the denial--both by policemen and by civilians--of the very rights the city is responsible for safeguarding. See, e.g., Traynor, Lawbreakers, Courts, and Law-Abiders, 41 Cal.St.B.J., 458, 478 (1966) (" 'The great advantage of police compliance with the law is that it helps to create an atmosphere conducive to a community respect for officers of the law that in turn serves to promote their enforcement of the law.' "), quoted in City of Oklahoma City v. Tuttle, 105 S.Ct. at 2447 n. 33 (Stevens, J., dissenting).
 
 
 41
 In sum, we reject the City defendants' contentions that as a matter of logic or law their deliberate indifference, if proven, to the possible use of excessive force by City police officers was insufficient to satisfy the requirement under Sec. 1983 that Fiacco prove that she was injured as a result of a City "policy."
 
 
 42
 B. The Admissibility and Sufficiency of the Evidence of a Policy of Deliberate Indifference
 
 
 43
 The City defendants contend that Fiacco should not have been allowed to introduce evidence of third-party claims and complaints against the City and that, even with such proof in the record, the evidence was insufficient to establish a policy of negligent supervision of police officers by the City defendants rising to the level of a deliberate indifference to the violation of constitutional rights. We reject both contentions.
 
 
 44
 1. Admissibility of Third-Party Claims and Complaints
 
 
 45
 Fed.R.Evid. 403 grants the trial judge broad discretion to determine whether to allow the introduction of relevant, but prejudicial, matters into evidence. When the trial judge has assessed both the probative value and the likely prejudicial effect of the evidence, the reviewing court wil not disturb his decision to admit or exclude evidence unless it finds an abuse of discretion. E.g., United States v. Martinez, 775 F.2d 31, 37 (2d Cir.1985); United States v. Robinson, 560 F.2d 507, 514-15 (2d Cir.1977) (en banc), cert. denied, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). We find no abuse of discretion here.
 
 
 46
 We have no doubt that, in the context of a theory that the City negligently supervised its officers in their use of force, the evidence that a number of claims of police brutality had been made by other persons against the City, together with evidence as to the City's treatment of these claims, was relevant. Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force. The City's knowledge of these allegations and the nature and extent of its efforts to investigate and record the claims were pertinent to Fiacco's contention that the City had a policy of nonsupervision of its policemen that reflected a deliberate indifference to their use of excessive force. The fact that none of the claims had yet been adjudicated in favor of the claimant was not material; if the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims.
 
 
 47
 Further, the value of such evidence to a plaintiff in a Sec. 1983 action is clear. Since the existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question, see City of Oklahoma City v. Tuttle; Turpin v. Mailet, 619 F.2d 196, 202-04 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), a plaintiff cannot prevail on a Sec. 1983 claim against a municipality without introducing other evidence. Proof that other claims were met with indifference for their truth may be one way of satisfying the plaintiffs' burden.
 
 
 48
 Given that the evidence of third-party claims was both relevant and valuable to Fiacco's case, the trial court did not abuse its discretion in determining that its probative value outweighed its possible prejudicial effect. The court properly attempted to minimize any such effect by repeatedly instructing the jury as to the limited purpose for which the evidence was admitted. The jury was instructed that there had never been any authoritative finding as to whether or not any claimant's charge was valid and that the jury was neither to assume that the claims were true nor to try to assess their truth; rather, the jury was merely "to focus [its] attention on [whether] the chief of police and/or the city [took] sufficient steps in their supervisory capacity in handling those claims."
 
 
 49
 In all the circumstances, we conclude that there was no abuse of discretion in the trial court's decision to admit into evidence against the City defendants proof as to the assertion of other claims of police brutality.
 
 
 50
 2. The Sufficiency of the Evidence of a Policy of Deliberate Indifference
 
 
 51
 The evidence presented by Fiacco to establish the existence of a policy of nonsupervision on the part of the City was of two types: evidence of the failure of the City defendants to adopt appropriate procedures to deal responsibly with complaints of police brutality, and evidence of their failure to make reasonable investigations of such complaints. The City defendants contend that the trial court should have granted their motion for a directed verdict because this evidence was insufficient as a matter of law to establish such a policy. We disagree.
 
 
 52
 In reviewing the denial of defendants' motion for a directed verdict, we, like the trial court in ruling on the motion, must view the evidence in the light most favorable to Fiacco, giving her the benefit of all reasonable inferences that may be drawn in her favor. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962) ("The Court of Appeals was, of course, bound to view the evidence in the light most favorable to Continental [the party against whom it ruled a verdict should have been directed] and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn.") (footnote omitted); Croce v. Kurnit, 737 F.2d 229, 237 (2d Cir.1984); 5A Moore's Federal Practice p 50.02, at 50-27 (2d ed. 1985). A directed verdict is proper only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970). With this standard in mind, we review the evidence presented at trial.
 
 
 53
 As to the police department's own supervision of its officers with respect to the use of force, Fiacco brought out through the testimony of Stark that in early 1978 the police department had adopted general rules and regulations that were set forth in a pamphlet entitled "Duties and Rules of Conduct," issued by the Bureau of Municipal Police, Division of Criminal Justice Services (hereinafter "Duties & Rules"). Duties & Rules contained the following statement with respect to the use of force by police officers:
 
 
 54
 Use of force: Officers shall not use more force in any situation than is reasonably necessary under the circumstances. Officers shall use force in accordance with law and departmental procedures.
 
 In its commentary, the pamphlet stated:
 
 55
 This section follows the general rule on use of force, i.e., use only that amount of force which is reasonable and necessary under the circumstances. Departmental procedures should spell out the details for use of force.
 
 
 56
 (Duties & Rules art. 11.25; emphasis added.) Stark testified that no written departmental procedures "spell[ing] out the details for use of force" were adopted.
 
 
 57
 As to the general framework within which the City dealt with civilian complaints of police brutality, Fiacco introduced sections of the City Charter which made the City's Public Safety Board ("Board") responsible for supervision of the police department and for hearing any charges against a police officer. The Charter authorized the Board to adopt and enforce reasonable rules for the government, discipline, and administration of police officers. Stark testified that the Board had adopted rules relating to police discipline, but that Stark had never seen them.
 
 
 58
 The Charter also established procedures to be followed by the Board in disciplinary hearings and stated that any charges filed with the Board must be in writing, in form prescribed by the Board. From its inception in 1978 through the time of Fiacco's arrest in April 1981, however, the Board provided no form on which a civilian could make a complaint against a police officer. During that period there were no hearings by the Board into any civilian claim of excessive force. Though the allegation that the City defendants had negligently failed to discipline police officers was not submitted to the jury (because the validity of claims that might have warranted such discipline had not yet been decided), Fiacco contended--and the jury could have found--that the above evidence showed that the City had in place general procedures relating to the appropriate supervision of police officers but had declined to implement them.
 
 
 59
 Finally, as to specific allegations of police brutality during the five years before the incident involving Fiacco, Fiacco introduced seven written claims that had been filed, called as witnesses four of the complainants, and elicited testimony from Stark as to his handling of complaints. The evidence relating to the five most recent claims, all made after Stark became police chief in 1977, included the following.
 
 
 60
 Daniel Terrance Malark testified that in June 1979, shortly after he had been injured in an automobile accident and was bandaged from waist to neck, he was arrested and taken to the City police station. In the course of obtaining personal data from Malark, police officers continually poked him, admonishing him to speed up his answers. When they asked Malark his social security number and he said he did not know it, defendant Meyer came to the bench where Malark was sitting and punched him in the face. Malark's head hit the wall behind him and he sustained a concussion and injury to his eye. Malark complained to Stark. Stark testified that he did not open an investigative file with respect to this complaint. He did not take a written statement from Malark; he did not obtain a written statement from anyone else. He did not assign anyone to investigate the complaint. He did not make any notation of the complaint in Meyer's file.
 
 
 61
 Robert J. Halse filed a claim against the City alleging that in July 1980 he was at his home when he was approached by a police officer who stated that he was going to arrest Halse for violation of the Vehicle and Traffic Law. The officer, without justification, struck Halse in the face with his nightstick and caused him to spend the night in jail without medical attention for his injuries. Stark testified that he did not assign anyone to investigate this claim; he investigated it himself and determined that there should be no disciplinary action. It is not clear of what Stark's investigation consisted; but it did not include talking to Halse, the complainant.
 
 
 62
 Margaret Mackey testified that in August 1980 a police officer, apparently in connection with activities of Mackey's son with a go-cart, hit Mackey four times with a night stick in order to gain entrance to her home. Mackey went to the police station to complain; while there she collapsed and had to be taken to the hospital because of the injuries she had suffered. Mackey says she thereafter complained to Stark. Stark recalled learning of the complaint but did not recall having spoken to Mackey about it. Stark did not assign anyone to investigate Mackey's complaint. He investigated it himself by simply talking to the officer accused. He concluded that the complaint was not true, apparently without having interviewed Mackey herself.
 
 
 63
 John Joseph Mellen testified that in December 1980 he was arrested and taken to the City police station. There three police officers, including defendant Meyer, kicked, punched, and beat him, leaving him with two black eyes and a swollen lip. Mellen, then a teen-ager, and his father went to Stark to complain. Stark testified that he recalled that Mellen had some discoloration around his eye at the time of this visit. Stark interviewed the accused officers. He did not open a file on the matter; he did not assign anyone to investigate; he did not take a written statement from Mellen; he did not check any medical records. He did check Mellen's arrest record, which was substantial; he concluded that no further investigation or action was required.
 
 
 64
 Henry Miller testified that in January 1981, while he was in a bar in the City, he was grabbed by persons who turned out to be plainclothes policemen and taken outside, where he was hit and slapped. He was handcuffed with his hands behind him, hit in the face with a nightstick, and thrown into a police car. Upon arriving at the police station, he was kicked out of the car and then lifted by the handcuffs and carried into the station. The handcuffs were fastened so tightly that they numbed his hands. Miller requested medical attention and then fainted. When he regained consciousness, one officer was standing on Miller's back; another had his foot on Miller's head. Miller was then required to strip down to his shorts and remain in a cell until a new shift of officers came on duty. He complained to these officers about the treatment he had received. Neither Stark nor any other member of the police department ever asked him for a statement regarding his claim of excessive force.
 
 
 65
 Stark testified that, with respect to each claim or complaint, he had conducted as much investigation as he thought necessary. He satisfied himself with respect to each of the claims described above that no departmental rules had been violated and no disciplinary action was warranted. No hearing was held on any of these claims. No officer was reprimanded, suspended, discharged, or demoted. With Stark's approval, Meyer, the subject of three complaints, including that of Fiacco, was promoted to sergeant.
 
 
 66
 Stark testified that in connection with certain claims not introduced by Fiacco, he had, prior to April 1981, discharged three police officers for use of excessive force. He acknowledged that at his deposition, taken more than a year before trial, he had testified that he had never discharged anyone for the use of excessive force, and that his answers to interrogatories had failed to mention any discharges. Stark testified that the discharge of one of these men came after he had been convicted of a felony; the other men were temporary policemen, one discharged for assaulting an elderly woman in her home and the other discharged for threatening someone with his blackjack and slapstick. When questioned about his failure to mention these events at his deposition or in his interrogatory answers, Stark said that the fact that he had ever discharged anyone for the use or threat of excessive force had, until a few days before trial, "slipped [his] mind."
 
 
 67
 The trial evidence left no doubt that the City endorsed Stark's handling of the complaints made after he became police chief. The City's mayor, who was a member of the Public Safety Board, testified that Stark informed him by telephone of every claim. Stark never put any of these reports in writing and apparently was never requested to do so.
 
 
 68
 Though the City defendants argue that this evidence was insufficient as a matter of law to establish that they had a policy of nonsupervision of police officers that amounted to a deliberate indifference to the use by those officers of excessive force, we are unpersuaded. The evidence was sufficient to permit the jury to find that the City Charter outlined procedures for the consideration of charges against policemen, but that in the period prior to Fiacco's arrest the Public Safety Board had never implemented those procedures and had never held a hearing into a civilian complaint against a policeman. The evidence showed that within the 22-month period preceding Fiacco's arrest, five complaints were made that City police officers had used excessive force, either in making arrests or in transporting or detaining those whom they had already arrested; four of the complaints came within the ten months preceding Fiacco's arrest. Any investigation of these charges was done by Stark himself, for he never assigned anyone else to make an investigation. Stark's sole investigative act in most instances consisted of questioning the officers accused. In none of these instances did Stark open an investigative file or place any notation in the officer's file. In no instance was any hearing held. In no instance did Stark take a written statement from any of the five complainants. He did not even interview three of them.
 
 
 69
 Drawing all reasonable inferences in favor of Fiacco, the jury could rationally have concluded that during the two years prior to Fiacco's arrest, the City defendants' response to complaints of use of excessive force by City police officers was uninterested and superficial. It could reasonably have inferred that a response to complaints that generally consisted solely of the chief's speaking to the accused officer--with no formal statement being taken from the complainant, no file being created, no notation being made in the officer's file, and no further investigation being made--would have been viewed by the officers, and should be viewed by an objective observer, as reflecting an indifference by the City to the use of excessive force. The permissibility of this inference is not diminished by the fact that none of the claims introduced by Fiacco had yet been adjudicated in favor of the claimants. The jury was free to reason that the very failure of the City defendants to conduct a nonsuperficial investigation into civilian claims of excessive force indicated that the City and the chief simply did not care what a thorough investigation would reveal, that they were indeed indifferent to whether or not excessive force was used.
 
 
 70
 Accordingly, we conclude that the evidence was sufficient as a matter of law to permit a rational juror to find that the City had a policy of nonsupervision of its police officers that amounted to a deliberate indifference to their use of excessive force. The trial court therefore properly denied the City defendants' motion for a directed verdict.
 
 
 71
 We find no greater merit in the contention that the verdict against the City defendants was so against the weight of the evidence that the court erred in denying defendants' motion for a new trial. Such a motion is committed to the sound discretion of the trial judge, see, e.g., Brady v. Chemical Construction Corp., 740 F.2d 195, 200 (2d Cir.1984); Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978), and we see no abuse of that discretion here. The arguments presented by the City defendants to the effect that Stark conducted an appropriate investigation in each instance and that the procedures used were, according to the City's expert witness, in accordance with accepted police practices, are arguments properly addressed to the jury. The jury rejected them, as it was free to do, and we conclude that the trial court did not abuse its discretion in refusing to overturn the jury's conclusions.
 
 IV. DAMAGES
 
 72
 All of the defendants attack the jury's award of damages to Fiacco on her Sec. 1983 claim, contending that, in light of the small award made on the negligence claims ($1,000), the jury was "estopped" from making a large award of damages ($75,000, now reduced by remittitur to $25,000) on the constitutional claim. Since there are various views of the evidence that would reconcile the two awards, we are not persuaded that the jury's verdict as to the amount of damages was inconsistent.
 
 
 73
 The jury had found for Fiacco on three categories of claims: one constitutional in dimension, one based on negligent infliction of injury, and one based on negligent failure to provide medical attention. Only two interrogatories as to the amount of damages were put to the jury, however. One asked it to assess the injury resulting from the deprivation of constitutional rights, and the other asked it to assess the injury resulting from negligence. Since the latter interrogatory made no distinction between the two categories of negligence, the jury's response to it does not specify whether its $1,000 assessment was of the damage resulting from the negligent infliction of injury or the damage resulting from the negligent failure to provide medical attention to the injuries. Thus, it is conceivable that the jury found that Fiacco suffered bodily injury in the amount of $75,000 and that those injuries were aggravated to the extent of $1,000 by the failure to provide her with prompt medical attention.
 
 
 74
 Further, it is possible that the jury placed a greater value on the constitutional right than on the right to be free from negligent injury. The trial court had instructed the jury that "there will be possibly different amounts of damages [that] could be awarded with reference to the federal claim as with reference to the state claims," and that in assessing the injury flowing from the constitutional deprivation, the jury might "wish to consider the importance of the right in our system of government, the role which this right has played in the history of our republic, and the significance of the right in the context of activities which the Plaintiff was engaged in at the time of the violation of the right."
 
 
 75
 Thus, the jury may well have placed a high value on the constitutional right to be free from the use of excessive force but found that the aggravation of Fiacco's physical injuries as a result of the negligent failure to provide her with medical attention was relatively small. Given this possibility, we conclude that the jury's verdicts as to damages were not inconsistent.
 
 V. THE CROSS-APPEAL AS TO THE REMITTITUR
 
 76
 Fiacco's cross-appeal challenging the order of the district court setting aside the verdict of damages as excessive and directing a new trial unless she agreed to a remittitur of $50,000 need not detain us long. A line of decisions stretching back into the past century has established that when a plaintiff has agreed to a remittitur order, he cannot challenge it either on an appeal, Donovan v. Penn Shipping Co., 429 U.S. 648, 649, 97 S.Ct. 835, 836, 51 L.Ed.2d 112 (1977) (per curiam); Kennon v. Gilmer, 131 U.S. 22, 29-30, 9 S.Ct. 696, 698-98, 33 L.Ed. 110 (1889), or on a cross-appeal, see, e.g., Woodworth v. Chesbrough, 244 U.S. 79, 82, 37 S.Ct. 583, 584, 61 L.Ed. 1005 (1917); Koenigsberger v. Richmond Silver Mining Co., 158 U.S. 41, 52, 15 S.Ct. 751, 756, 39 L.Ed. 889 (1895); see also 6A Moore's Federal Practice p 59.08, at 59-206 (2d ed. 1984) ("If the defendant appeals, plaintiff may not seek to restore the remitted amount by cross-appeal, or as an appellee argue for restoration of the original verdict...."). While an exception to this rule may be made where the appellate court has vacated the judgment, see Akermanis v. Sea-Land Service, Inc., 688 F.2d 898, 903-04 (2d Cir.1982), cert. denied, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), no such exception is applicable here. Having accepted the remittitur order and thereby consented to the reduced verdict, Fiacco is prohibited from challenging the remittitur order. The cross-appeal is, accordingly, dismissed.
 
 CONCLUSION
 
 77
 The judgment of the district court awarding Fiacco $25,000 against all defendants on her Sec. 1983 claim is in all respects affirmed.