Fred Rodney SARUS and Nandor S. Sarus, Plaintiffs–Appellees,

v.

Benny ROTUNDO, individually, and as Chief of Police of the City of Utica, New York; and the City of Utica, New York, Defendants–Appellants,

Raymond Zdanowicz, individually, and as a police officer, Utica, New York; Richard Citro, individually, and as a police officer, Utica, New York; Louis Paciello, individually, and as a police officer, Utica, New York, Defendants.

Nos. 1326 to 1329, Dockets 87–7053, 87–7055, 87–7061 and 87–7105.

United States Court of Appeals, Second Circuit.

Argued July 13, 1987.

Decided Oct. 15, 1987.

Stephen G. Schwarz, Utica, N.Y. (Armond J. Festine, Corp. Counsel of the City of Utica, N.Y., of counsel), for defendant-appellant City of Utica.

Thomas C. Kingsley, Utica, N.Y. (Petrone & Petrone, P.C., Utica, N.Y., of counsel), for defendant-appellant Benny Rotundo.

Stephen L. Lockwood, Utica, N.Y. (Lockwood & Lockwood, Utica, N.Y., of counsel), for plaintiffs-appellees.

Before NEWMAN, MINER and ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

Plaintiffs-appellees Fred and Nandor ("Steve") Sarus commenced separate actions in the United States District Court for the Northern District of New York (McCurn, J.) against defendants Utica police officers Raymond Zdanowicz, Richard Citro and Louis Paciello, and defendants-appellants City of Utica, New York and its Chief of Police, Benny Rotundo. The complaints alleged violations of appellees' civil rights, *see* 42 U.S.C. § 1983 (1982), and pendent state claims against the individual officers for malicious prosecution, false arrest and imprisonment, and use of excessive force, arising from appellees' arrests after an altercation in a bar in Utica. The complaint also alleged, pursuant to section 1983, that the City and its Chief of Police (the "city defendants") were responsible for a policy or custom of deliberate indifference to civil rights that led to the violations attributed to the officers.

The jury returned verdicts in favor of appellees against the individual officers as well as against the city defendants. Only the City and Chief Rotundo have appealed. We reverse.

## I. BACKGROUND

Because this appeal concerns only those portions of the verdict involving the city defendants, we restrict our recitation of the background primarily to those facts relevant to appellees' claims against the City and Chief Rotundo. The events giving rise to this action occurred on February 25, 1984 at a bar in Utica, where appellees Fred and Steve Sarus were spending the late evening hours with their brother George. Two physical altercations occurred between George Sarus and another patron of the bar, Michael Wyborski. Appellees interceded successfully on both occasions but, as George and Steve Sarus were about to leave the area, they were asked to return to the bar by defendants Zdanowicz, Citro and Paciello, police officers for the City of Utica, who had arrived to investigate the incident.

Trial testimony as to the ensuing events differed significantly. Appellees and their witnesses testified that one of Wyborski's friends, Louis Garramone, entered the bar in the company of the officers and struck George Sarus in the face. After Steve Sarus came forward to restrain his brother, the officers subdued Steve with mace. Steve and George then were handcuffed and placed under arrest. When Fred Sarus, who had not been involved in the confrontation with the officers, requested permission to accompany his brothers to the police station, he also was arrested, handcuffed and allegedly slammed against the officers' vehicle.

The officers and their witnesses testified that, having been informed by other customers at the bar that the three Sarus brothers had beaten Wyborski, the officers attempted to take the Saruses into custody. According to this line of testimony, the Saruses physically resisted the officers' custodial overtures, and when Steve broke away from the officers, they sprayed him with mace to prompt his compliance.

The Sarus brothers were taken to the Utica jail, where they were held until formally charged with assault and resisting arrest. They were released after bail was posted. The Saruses claim that, while in

custody, they were placed in a "filthy" cell and given nothing to eat or drink. Steve Sarus received no treatment for his mace burns, which apparently required subsequent dermatology treatment. Following a state jury trial, George Sarus was convicted of assault and resisting arrest. Fred Sarus was acquitted of both charges, and Steve Sarus was convicted of resisting arrest, but was acquitted of the assault charge.

Steve and Fred Sarus subsequently commenced separate actions in the district court on May 24, 1985; each sought $500,-000.00 in compensatory damages and $500,-000.00 in punitive damages. They asserted against the individual officers federal civil rights and pendent state claims of false arrest and malicious prosecution, and federal claims of police brutality. Appellees also asserted claims against the City of Utica and the Utica Chief of Police, Benny Rotundo, pursuant to section 1983. Appellees' theory of liability against the city defendants was that improper training and supervision of the Utica police force, and inadequate record keeping of citizen complaints against police officers, constituted a municipal policy that led to the alleged deprivations of appellees' civil rights.

A jury trial began on November 13, 1986 before Judge McCurn. Appellees' claims of liability as against the city defendants rested solely on the testimony by Chief Rotundo and the City Commissioner of Public Safety, Alfred Bruni. Rotundo testified that, while the Department maintained no internal affairs division, any complaints received by the Department were referred for investigation to the commanding officer of the policeman whose conduct formed the basis of the complaint. He testified also that other governmental units shared responsibility for the investigation of citizen complaints; the mayor's office, the Human Relations Commission, and the Public Safety Commission independently pursued any citizen complaints filed with those offices. While the Department maintained no central filing system for the accumulation of all complaints received, any complaint resulting in disciplinary action against an officer was noted in that offi-

cer's permanent personnel file; complaints that did not result in disciplinary action were simply filed under the name of the citizen complainant.

Commissioner Bruni's description of the manner in which complaints were investigated differed in no significant respect from that contained in Rotundo's testimony. Bruni, who had assumed his position as public safety commissioner only one month prior to the Saruses' arrests, stated that he pursued any complaints received by his office. Counsel for appellees also elicited testimony from Bruni as to the number of resisting arrest charges filed by Utica police officers. Proceeding on the unproved premise that resisting arrest charges frequently are filed as a means of concealing the use of excessive force in apprehending suspects, these figures apparently were adduced in an attempt to establish a pattern of police brutality. However, appellees offered no evidence of corresponding statistics from other police departments to establish a basis for comparison.

After denying the city defendants' motions for directed verdicts, Judge McCurn submitted to the jury special verdict forms, which read, in pertinent part:

(4) Do you find for [plaintiff] against the City of Utica on the FEDERAL CIVIL RIGHTS CLAIM BASED ON FAILURE TO PROVIDE PROPER TRAINING FOR POLICE OFFICERS AND PROPER REPORTING OF CITIZENS' COMPLAINTS CONCERNING POLICE BRUTALITY OR MISCONDUCT?

If your answer above is YES, do you find that Police Chief Benny Rotundo is the person responsible for setting and implementing the police department policy such that he should be held liable along with the City of Utica?

On November 25, 1986, the jury returned verdicts against the officers for false arrest and imprisonment, malicious prosecution, and the use of excessive force. Having responded affirmatively to both questions set forth above, the jury also returned verdicts against the City and Chief

Rotundo. The judgments reflected the jury's awards to each appellee of $25,-000.00 in compensatory damages against all defendants and $8,000.00 in punitive damages. The punitive awards each included $5,000.00 in damages against Chief Rotundo. Judge McCurn denied the city defendants' motions for judgments n.o.v.

Only the City of Utica and Chief Rotundo have appealed. Contending that appellees failed to establish a policy for which they may be held liable, they attack as erroneous Judge McCurn's denial of their motions for directed verdicts and for judgments n.o.v. Finding merit in these claims, we now reverse.

## II. DISCUSSION

Dispositions of motions for directed verdicts, *see* Fed.R.Civ.P. 50(a), and motions for judgments n.o.v., *see* Fed.R.Civ.P. 50(b), are reviewed by application of a single standard, *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 121 (2d Cir.1984): "[T]he test to be applied by the court of appeals is the same as that originally applied by the trial judge," *id.* (citing *O'Connor v. Pennsylvania Railroad Co.*, 308 F.2d 911, 914 (2d Cir.1962)). Rule 50 motions are to be "granted only when, viewing the evidence most favorably to the party other than the movant, 'there can be but one conclusion as to the verdict that reasonable men could have reached.'" *Diebold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 57 (2d Cir. 1986) (quoting *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir. 1980)).

In light of our conclusion, *infra*, that appellees failed entirely to present sufficient evidence from which the jury could infer the existence of an actionable municipal policy, we hold that no reasonable person could find that such a policy motivated the police officers' actions. It therefore

was error for the district court to deny appellants' Rule 50 motions.

■ A municipality may be held liable as a "person" within the meaning of section 1983, *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), for violations of civil rights caused by the municipality's policy or custom, *id.* at 694, 98 S.Ct. at 2037. To recover against the municipality, it must be demonstrated that the official policy in question constitutes "the moving force of the constitutional violation," *id.* Therefore, to prevail against municipal defendants,[1] first, a section 1983 plaintiff must "prove the existence of a municipal policy or custom" that caused his injuries and, second, "plaintiff must establish a causal connection ... between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir.1985) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 & n. 8, 105 S.Ct. 2427, 2436 & n. 8, 85 L.Ed.2d 791 (1985) (plurality opinion); *id.* at 829–30, 105 S.Ct. at 2439–40 (Brennan, J., concurring)), *cert. denied*, — U.S. —, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987).

The case at bar is to be distinguished from section 1983 actions in which the existence of an official municipal policy was undisputed. *See, e g., Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Monell*, 436 U.S. at 661, 98 S.Ct. at 2020. The instant appeal presents a situation in which the existence of such a policy is contested and appellees have pointed to no written directive or regulation establishing the purported policy upon which appellees rely.

■ We previously have held, however, that a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials, *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert.*

---

1. The special verdict forms submitted to the jury by the district court permitted recovery against Chief of Police Rotundo upon a finding that he was "responsible for setting and implementing the [municipal] policy." Our conclusion, *infra*, that the jury could not have inferred the existence of an actionable municipal policy from the evidence presented at trial obviates the need for a separate discussion of the verdict against Chief Rotundo.

*denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), and that "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell,*" *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) (citing *Turpin,* 619 F.2d at 201–02). *See also Fiacco v. City of Rensselaer,* 783 F.2d 319, 326 (2d Cir.1986) (a municipality may be subjected to section 1983 liability on the basis of a policy that tolerates unconstitutional acts by its employees), *cert. denied,* — U.S. —, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). To support such an inference it must be demonstrated that the municipality's failure to supervise or properly train its police force is so severe as to constitute "gross negligence" or "deliberate indifference" to a plaintiff's rights. *Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42, 45 (2d Cir.1985) (citing *Owens v. Haas,* 601 F.2d 1242, 1247 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979)).

■ The issue before us, then, is whether sufficient evidence was presented at trial from which the existence of an actionable municipal policy could be inferred. In this regard, we think it instructive to compare appellees' evidentiary showing to the evidence we found sufficient to support such an inference in *Fiacco.* In *Fiacco,* plaintiff introduced evidence of the inadequacy of the city's procedures for resolving police brutality claims, as well as evidence of seven written claims of police brutality filed with the police department prior to the incident involving plaintiff. Four of the complainants testified at trial as to the circumstances giving rise to their complaints. The chief of police testified that, under the department's customary procedures, he alone conducted all investigations of citizen complaints. No written statements were taken from the complainants, and the police chief even failed to interview three of the complainants. In each case, the chief merely had satisfied himself that no disciplinary action was warranted; as a result, no disapproval of the officers' con-duct was expressed, no record of the complaints was maintained in any departmental files, and no further review of any kind was provided. We concluded that, based on this evidence, the jury reasonably could have inferred an official policy of nonsupervision constituting deliberate indifference to police misconduct. *Fiacco,* 783 F.2d at 331.

In marked contrast, the record before us is wholly devoid of any evidence of inadequate training or supervision within the Utica police department. As noted previously, appellees relied exclusively upon the testimony of Chief Rotundo and Commissioner Bruni to establish their claims against appellants. Uncontradicted testimony of Chief Rotundo indicated that the City provides training for its officers that far exceeds the minimum training periods prescribed by the State of New York, and that annual in-service refresher courses are conducted. As opposed to the situation presented in *Fiacco,* the testimony of Chief Rotundo and Commissioner Bruni made clear that, despite the lack of a formal internal affairs division within the department, no unbridled discretion was vested in Rotundo with respect to dispositions of citizen complaints. Those charges filed with the department were first referred to the commanding officer of the policeman whose conduct prompted the complaint. Further, not all complaints were resolved by the police department; for example, charges of police misconduct received by the Public Safety Commission were investigated by Bruni. While a more formal process might be preferred, appellees offered no evidence that the Utica procedures differed in any way from those employed by other municipalities.

We note also that, unlike *Fiacco,* where evidence was presented that no disciplinary actions were instituted against individual officers, Rotundo testified that he could recall at least a dozen formal disciplinary proceedings against Utica officers. As a result, the record provides no basis for the jury to conclude that Utica's system was lacking in any way, let alone so deficient as to reflect a policy of deliberate indifference

to the civil rights of the citizenry. *See, e.g., Batista,* 702 F.2d at 399 (denial of city's judgment n.o.v. motion reversed where, although there was some evidence of prior civil rights violations by officers who were not disciplined, there was no evidence that defendant officers knew of those prior incidents or were aware of any policy purportedly condoning civil rights violations); *Turpin,* 619 F.2d at 202–03 (no demonstration of policy condoning unconstitutional action by city employees where only evidence presented was plaintiff's own arrest and failure to discipline the arresting officer for prior use of excessive force).

■ Appellees criticize the manner in which citizen complaints are filed by the Utica police department, characterizing this filing system as evidence of a policy condoning police misconduct. However, we are neither directed to, nor aware of, any authority that imposes upon a police department the duty to maintain a cross-indexed filing system under which all complaints received, no matter how baseless, must be placed in that officer's personnel file. At oral argument, counsel for appellees seized upon the filing system to excuse appellees' failure to present even *one* prior incident of police misconduct—evidence viewed as essential in *Fiacco.* Counsel conceded that he had failed to review even the files of the three individual officers involved to ascertain whether any of them had been cited for similar incidents in the past. We find this failure to pursue even the most elementary of discovery procedures to be inexcusable, and we are loath to affirm a finding of a policy of indifference to police misconduct when not even a single incident of other misconduct was presented.[2] Neither may much significance attach to Commissioner Bruni's testimony as to the number of resisting arrest charges filed by Utica police officers, in light of appellees' failure to adduce evidence of the circumstances surrounding those arrests, or even to present corresponding figures from other police departments to determine whether Utica's were excessively high.[3]

In sum, the only relevant evidence presented by appellees was the manner in which they themselves were arrested. We previously have made clear that, "absent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy [may] not ordinarily be inferred from a single incident of illegality." *Turpin,* 619 F.2d at 202. *See also Singleton v. City of New York,* 632 F.2d 185, 195 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981). In *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), the Supreme Court considered the issue now before us. The Court reversed a judgment against a municipality because the jury charge permitted the inference of a policy solely from a single incident of police misconduct. *Id.* at 823–24, 105 S.Ct. at 2436–37. Both the plurality and concurring opinions in *Tuttle* make clear that, in the absence of other evidence, mere proof

**2.** Some uncertainty arose at oral argument as to a potential inconsistency between the special verdict forms submitted to the jury and Judge McCurn's charge to the jury from the bench. While the verdict forms seem to require a finding of inadequate training *and* improper record keeping of citizen complaints for a verdict against the City, portions of Judge McCurn's charge appear to permit such a verdict on the basis of *either* finding. Irrespective of the jury's resolution of this potential inconsistency, our conclusion remains unaffected. If the jury adopted a conjunctive reading, the verdict may not stand in light of the lack of evidence as to inadequate training and supervision. If the jury adopted a disjunctive reading, the verdict also must be overturned because either element, standing alone, is insufficient to impose liability under the circumstances of this case.

**3.** Judge McCurn expressed concerns throughout trial about appellees' failure to introduce any expert testimony as to proper police procedures as a means of aiding an evaluation of the adequacy of Utica departmental policies. Although expert testimony is not essential to section 1983 actions of this nature, it is instructive to note that even expert testimony as to the gross inadequacy of departmental procedures has been viewed by the Supreme Court as inadequate to establish a policy of "deliberate indifference" where only one incident of alleged police brutality was demonstrated at trial. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985).

of a single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury. *Id.* at 824, 105 S.Ct. at 2436 (plurality opinion); *id.* at 833, 105 S.Ct. at 2441 (Brennan, J., concurring). Because appellees here failed to present relevant proof of a municipal policy or custom beyond their own arrests, the evidence presented at trial was inadequate as a matter of law to support the jury's verdict against the city defendants.

### III. CONCLUSION

For the foregoing reasons, we hold that it was error for the district court to deny appellants' motions for directed verdicts and for judgments n.o.v. We therefore reverse, remand and direct entry of judgment for appellants.