**Michael LONGIN, an infant, by his parents, Milan LONGIN and Sodina Longin, individually and in their own capacity, Plaintiffs,**

v.

**Kevin KELLY and The City of New York, Defendants.**

**No. 90 CIV 2466 (AGS).**

United States District Court, S.D. New York.

Jan. 18, 1995.

Jacoby & Meyers, New York City, for plaintiffs.

Tellerman, Paticoff & Greenberg, New York City, for defendant Kevin Kelly.

Paul A. Crotty, Corp. Counsel of the City of New York, New York City, for defendant City of New York.

## OPINION AND ORDER

SCHWARTZ, District Judge:

This action arises from an altercation on May 22, 1989 in which defendant Kevin Kelly, a New York City Correction Officer, shot plaintiff Michael Longin. Plaintiffs assert federal and state claims against defendant Kelly individually and the City of New York (the "City"). The City moves for summary judgment dismissing plaintiffs' federal claim, brought pursuant to 42 U.S.C. § 1983, and plaintiffs' state claims asserted under theories of negligence and *respondeat superior.* For the reasons set forth below, we grant the City's motion for summary judgment.

## BACKGROUND

The incident underlying this action occurred sometime after midnight on May 22, 1989 at a park located at Shore Road and Pacific Boulevard in Long Beach, New York. Deposition of Michael Longin ("Longin Dep.") at 42. The park is located approximately one half block from the residence of plaintiff Michael Longin. *Id.* at 43. The park is also located approximately 300 feet from the apartment building where defendant Kelly resides. Deposition of Kevin Kelly ("Kelly Dep.") at 90. Kelly was off-duty from his position as a Correction Officer at the time of the incident. Kelly Dep. at 19, 21, 91.

Prior to the incident, plaintiff and three friends were in the park—drinking beer and making noise. Longin Dep. at 62, 68, 70; Kelly Dep. at 97. Defendant Kelly called the Long Beach police and notified them that people were trespassing in the park and making noise while there. Kelly Dep. at 101–103. Kelly averred further that he possessed a communal interest in the park, and it was this interest that motivated him to call the police. *Id.* at 103–104.

Shortly thereafter, Kelly entered the park and told plaintiff and his friends that they were making too much noise, that they should leave the park, and that the police would be arriving soon.[1] Longin Dep. at 71; Kelly Dep. at 98. Plaintiff Michael Longin asked Kelly if he was a police officer. Longin Dep. at 74. Longin testified that Kelly responded that he was and showed the youths his badge. *Id.*[2]

Plaintiff Michael Longin and defendant Kelly differ in their versions of subsequent events. At his deposition, Longin testified that when he picked up the remaining beers, defendant Kelly asked him if he was over twenty one years old and refused to allow plaintiff and his friends to take the beers because they were underage. Longin Dep. at 74, 77. Longin further testified that he and his friends waited ten minutes for the police and then tried to leave the park, at which point Kelly tried to take the beers from plaintiff. Longin Dep. 78–79. This action, according to plaintiff, instigated a fight during the course of which defendant Kelly grabbed plaintiff around the neck and shot him in the left shoulder. Longin Dep. 83–85.

By contrast, defendant Kelly stated that after he confronted plaintiff Michael Longin and his friends in the park, a second confrontation took place in the street outside the park. Kelly Dep. at 92. Kelly testified that he left the park and walked toward his car when he was hit in the back of the head with a beer can. Kelly Dep. at 136. He turned

---

1. Kelly characterized these statements as a "suggestion" and the giving of "advice" rather than an order. Kelly Dep. at 98–99. Plaintiff Michael Longin also acknowledged that Kelly asked politely that he and his friends leave the park. Longin Dep. at 71.

2. Kelly averred that he identified himself as a "Peace Officer." Kelly Dep. at 80.

around and discovered that plaintiff and his friends had surrounded him on three sides. Kelly Dep. at 137. He averred that he displayed his badge a second time, but was nevertheless attacked by plaintiff and his friends, which attack was still going on when the police arrived. Kelly Dep. at 106, 137. According to defendant Kelly, it was during this attack, in the street outside the park, that the shooting took place. Kelly Dep. at 92.

### Pre–Employment Screening of Correction Officers

The City administers a civil service examination for the position of correction officer. From those who take that test, the City compiles a list of eligible candidates. Each candidate on the list is subject to pre-employment screening, which includes medical and psychological evaluations, a check of past employment, investigation of any parking violations, a review of the candidate's motor vehicle abstract, and an examination of the candidate's educational background. Deposition of Alan Vengersky, ("Vengersky Dep."), Director of Personnel, New York City Department of Correction ("DOC"), at 8. In all instances, Mr. Vengersky makes the final decision with respect to the hiring of an eligible candidate. Vengersky Dep. at 5–6.

With respect to the psychological screening of eligible candidates, Mr. Vengersky relies upon the recommendations of the psychologist retained by the DOC to conduct the testing, Robin Inwald, Ph.D. Vengersky Dep. 9–11. Dr. Inwald is a nationally recognized expert in the field of psychological testing for law enforcement positions, whose DOC testing regimen (designed by Dr. Inwald in 1978) has become a national model. Deposition of Robin Inwald, Ph.D. ("Inwald Dep.") at 9, 11, 78.

Dr. Inwald rates eligible candidates on a scale of "1" to "5" based on the psychological screening process, which includes a personal interview as well as administration of the Inwald Personality Inventory, the Minnesota Multiphasic Personality Inventory, a person-al history questionnaire, a skill scale inventory, and other tests. Dr. Inwald stated at her deposition that no testing or interviewing system can reliably predict the likelihood that an eligible candidate will use deadly force inappropriately while on or off duty. *Id.* at 14–16, 119. Dr. Inwald recommends that DOC decline to hire candidates who receive a "4" or "5" on this scale, *id.* at 34, and Mr. Vengersky adheres to this recommendation in nearly all instances. Vengersky Dep. at 53. Where an eligible candidate receives a rating of "3," Mr. Vengersky testified that he gives increased attention to the candidate's background check.[3] *Id.* at 51. No candidates are automatically hired on the basis of the rating on the psychological screening alone. *Id.* at 53–54.

Defendant Kelly underwent the foregoing psychological screening process and received a rating of "3." Based on the results of defendant Kelly's psychological tests, which revealed an elevated level of defensiveness, along with his history of motor vehicle violations, Dr. Inwald's office recommended that the DOC exercise "careful scrutiny" of defendant Kelly's biographical data. Inwald Dep. at 31.

### Standard for Summary Judgment

■ Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Second Circuit has stated that a "moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case ..." *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1222–23 (2d Cir.1994). The burden of proof, however, lies with the moving party and we must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Id.* The moving party must satisfy its burden of demonstrating the absence of a genuine issue

---

**3.** Data gathered since 1978 show that 30 to 35 percent of the eligible candidates screened receive a "3." Inwald Dep. at 36. In recent samples, 40 to 48 percent of the screened candidates have received a "3." *Id.*

of material fact, which can be done by pointing out that there is an absence of evidence to support the nonmoving party's case (and as discussed above, all ambiguities are resolved in the nonmoving party's favor). *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by a "showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

As set forth below, we find that the City has established that no issue of material fact exists as to plaintiffs' claims against the City in this action.

## Plaintiffs' Federal Claims

■ Under 42 U.S.C. § 1983, a municipality may not be held liable for actions of its employees based on respondeat superior. *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Rather, in order to establish municipal liability for unconstitutional acts by municipal employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom, policy or practice. *Id.; Oklahoma City v. Tuttle*, 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986), *cert. den.*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987).

■ Plaintiffs' theory of municipal liability derives exclusively from the single incident underlying this action; specifically, alleging that the City failed to properly screen, hire, and train defendant Kelly with respect to the use of force as a correction officer. This theory, focusing on one incident involving one officer has been examined and rejected by the courts. The Supreme Court and the Second Circuit have held that, "absent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy may not ordinarily be inferred from a single incident of illegality." *Sarus v. Rotundo*, 831 F.2d 397, 402 (2d Cir.1987), citing

*Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791. The law thus requires, except in certain special instances not applicable here, that a plaintiff present some proof of municipal policy or custom evidenced by occurrences other than the incident that involved plaintiff. In fact, the Second Circuit in *Sarus* explicitly compared the facts of that case, in which the plaintiffs relied solely upon the circumstances of their arrest to demonstrate a municipal policy—a showing that the court found wholly inadequate—with the evidentiary showing made by the prevailing plaintiff in *Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir.1986), an action in which plaintiff submitted evidence not only of other incidents of police brutality but also evidence consisting of expert evaluations as to the inadequacy of the Rensselaer police department's process for handling citizen complaints of police brutality. *See also Walker v. City of New York*, 974 F.2d 293, 299 (1992) (reversing District Court's dismissal of plaintiff's § 1983 claim on the ground that "[i]f [plaintiff] can produce some evidence that policymakers were aware of a pattern of perjury by police officers but failed to institute appropriate training or supervision, his claim can survive summary judgment"); *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir.1991) (finding plaintiff's documentation sufficient to allege municipal policy or custom, but declining to set minimum standard).

■ To the extent that plaintiffs have even attempted to articulate a claim of liability as to which we might infer a municipal policy amounting to deliberate indifference from an identified failure by the City to screen, train, or supervise its correction officers, that theory is fatally flawed. More precisely, plaintiffs argue that the City acts with deliberate indifference by "automatically" appointing those correction officer candidates whom its psychological expert, Dr. Inwald, scores as a "3" on a scale of "1" to "5" on the battery of psychological tests employed by the City. Plaintiffs's Local Rule 3(g) Statement ¶ 15; Kelly's Mem. pp. 2–3. This assertion is in direct conflict with the undisputed testimony of Mr. Vengersky. As noted *supra* at 199, Mr. Vengersky stated at his deposition that

no candidates—even those who receive a score of "1" or "2"—are automatically appointed based upon their psychological rating. Vengersky Dep. pp. 53–54. Mr. Vengersky averred that, as the official charged with the discretion to make all final hiring decisions with respect to correction officers, he reviews not only the results of Dr. Inwald's psychological reports, but also the results of a background investigation conducted by the DOC. *Id.* at 55. Mr. Vengersky testified further that as to those candidates who receive a rating of "3" from Dr. Inwald, he reviews the background check with careful scrutiny—precisely the recommendation of Dr. Inwald in such circumstances. *Id.* at 51; *see also* Psychological Screening Report for Kevin Kelly, attached as Exhibit 8 to Affidavit of Steven Thaler, Esq. ("Thaler Aff.") (text accompanying box where score of 3 is to be recorded on the form "[s]uggest[s] careful scrutiny of all records by Director of Personnel" for any candidate who receives this rating).

■ Plaintiffs furnish no evidence that the foregoing process is inadequate, much less so faulty as to demonstrate the City's deliberate indifference to the rights of persons such as plaintiff Longin. First, counsel stated at oral argument that plaintiffs do not intend to offer independent expert testimony disputing the adequacy of the psychological screening process designed by Dr. Inwald, her recognized expertise in the field of psychological screening, or the use of the DOC psychological screening program (designed by Dr. Inwald) as a national model. *See* City's Local Rule 3(g) Statement ¶¶ 15, 16, 18, 28, 29. Second, plaintiffs offer no evidence either that the background check of candidates for correction officer conducted by DOC is insufficient, that Mr. Vengersky's special scrutiny of the background check in instances where a candidate receives a psychological rating of "3" is inadequate [4], or that the City failed to follow the foregoing procedure in the hiring of defendant Kelly. Finally, plaintiffs have furnished no support for the inference that the failure of the DOC to punish Kelly as a result of this incident evidences a systemic failure to discipline correction officers for the use of force.[5] Accordingly, we conclude that under the standards of *Monell* and its progeny, set forth *supra* at 200, the undisputed facts establish that plaintiffs have failed to demonstrate that the alleged violation of their constitutional rights resulted from a custom, policy, or practice of the City.

## Plaintiffs' State Law Claims

### Respondeat Superior

■ Under New York law, an employer may be held liable based on a theory of

---

4. We again note that the City has submitted evidence that, in recent samples, 40–48% of the candidates screened by DOC received a psychological rating of 3. City's Local Rule 3(g) Statement, ¶ 23. Plaintiffs are unable to cite any authority to support the proposition that the Constitution requires the City to disqualify so large a proportion of the available candidates—so high a percentage, in fact, that the City would likely be unable to fulfill its hiring needs if those candidates were eliminated from consideration. Nor have plaintiffs demonstrated that such a drastic move is even indicated with respect to candidates who receive a "3," in light of Dr. Inwald's testimony that no psychological test can alone predict a propensity for violence and that defendant Kelly's test scores were not predictive of job related problems. This evidence suggests that the City's method of screening and hiring correction officers, namely placing significant, but not exclusive, reliance upon psychological testing along with an array of other screening mechanisms including a background check, is a sensible one. As noted, however, we need not, and do not make such a finding in order to reject plaintiffs' *Monell* claims. We find solely that plaintiffs have failed to frame an issue of fact as to whether the City's method of screening and hiring correction officers is deliberately indifferent to the rights of persons such as plaintiff Longin.

5. We note that plaintiffs offer no explanation as to how the failure to discipline Kelly for this incident could possibly have caused the incident (i.e., the demonstrated causal relationship between the alleged failure to screen, hire, or discipline personnel and the alleged constitutional violation required by *Monell*). As explained *supra* at 200, the failure to discipline a single officer cannot give rise to an inference of deliberate indifference without further evidence of a municipal policy or practice. Moreover, the undisputed record indicates not that the City refused to initiate disciplinary proceedings against defendant Kelly, but instead that the City made a discretionary determination not to pursue those proceedings based, in part, on the lack of credibility of plaintiff Michael Longin. *See* DOC Intradepartmental Memorandum, attached as Exhibit 3 to Thaler Aff., at 3.

respondeat superior only where an employee was engaged in the furtherance of the employer's enterprise at the time of the employee's wrongdoing, and the employer was or could have been exercising some control over the employee's activities. *E.g., Lundberg v. State of New York*, 25 N.Y.2d 467, 306 N.Y.S.2d 947, 950, 255 N.E.2d 177, 178–79 (1967). In the context of the actions of off-duty peace officers, New York courts have stated that "where an employee's conduct is brought on by a matter wholly personal in nature, the nature of which is not job-related, his actions cannot be said to fall within the scope of his employment." *Stavitz v. City of New York*, 98 A.D.2d 529, 531, 471 N.Y.S.2d 272, 274 (1st Dep't 1984) (holding that City of New York was not liable for assault committed by off-duty police officer on neighbors with whom the officer had a personal disagreement); *see also Turk v. McCarthy*, 661 F.Supp. 1526, 1536 (E.D.N.Y.1987) ("New York case law makes clear that a police officer's arrest of a citizen does not provide a basis for governmental liability where the arrest stems from a purely personal dispute rather than constituting an action taken in furtherance of the officer's duties as a member of the police force."); *Fuller v. City of Yonkers*, 100 A.D.2d 926, 927, 474 N.Y.S.2d 813, 815 (2d Dep't 1984) (declining to hold municipality liable for injuries caused by off-duty police officer in removing his daughter from a bar because officer was acting in furtherance of personal interests rather than as a city employee).

■ While plaintiff Michael Longin and defendant Kelly, at their respective depositions, have provided conflicting versions of the incident at issue, the testimony of each of them inevitably establishes that it is undisputed that Kelly did not act within the scope of his employment in shooting Michael Longin. As a threshold matter, it is not disputed that at the time of the incident, Kelly was both off-duty and on medical leave from his position. Kelly Dep. at 19–20. Second, Kelly stated that, prior to confronting Longin and his friends in the park adjacent to Kelly's apartment building, he contacted the Long Beach police by telephone from his apartment and informed them that some people were making noise and trespassing in the park. *Id.*, at 101–03. He acknowledged that he had a communal interest in the park and acted out of that communal concern. *Id.*, at 103–04. Kelly testified that, notwithstanding his having called the police and his understanding that they were on the way to the park, he proceeded to the park himself. Upon Kelly's entrance into the park, he told plaintiff and his friends that they were making too much noise, that the police had been notified, and that the young men should leave before the police arrived. Longin Dep. at 71; Kelly Dep. at 98. These undisputed facts demonstrate that Kelly did not act to advance any interest of the DOC or of the City on the night of May 22, 1989 but rather to advance his own interests as a member of the community in which he resides.

The differing versions of the actual altercation do nothing to alter this conclusion. Plaintiff Michael Longin averred that the shooting occurred when defendant Kelly attempted to take Longin's beer away from him. Longin Dep. at 78–79. By contrast, Kelly contended that the shooting took place in the street while plaintiff and his friends were attacking him. Kelly Dep. at 92, 106. What is most important is that neither participant depicts the incident as anything more than a personal dispute.

■ Plaintiffs' theories in support of their contention that defendant Kelly acted within the scope of his employment in the May 22, 1989 incident are meritless. First, plaintiffs' reliance on Kelly's use of his off-duty weapon in the altercation is misplaced. The legal authorities cited *supra* at 11–12, make clear that a peace officer's use of his weapon while off-duty is not, by itself, sufficient to establish that the officer's wrongdoing was undertaken within the scope of his employment. *See, e.g., Turk, supra; Fuller, supra; see also Kelly v. City of New York*, 692 F.Supp. 303 (S.D.N.Y.1988) (finding off-duty police officer not to have acted in scope of his employment in incident involving his weapon because the dispute was personal in nature). Second, plaintiffs' assertion that Kelly acknowledged that he shot plaintiff within the scope of employment is of no moment because: 1) Kelly stated at his deposition that

he was not acting under any authority in addressing plaintiff and his friends but was rather merely making a "suggestion" and giving "advice"; and 2) Kelly's subjective characterization of the incident is not dispositive of the issue of whether he acted within the scope of his employment. *E.g., Turk, supra; Stavitz, supra; Fuller, supra.*[6]

Finally, plaintiffs have cited no general, special or local law, or charter, rule, regulation, judgment or order that Kelly was either required, authorized or purporting to enforce pursuant to his special duties as a correction officer. This circumstance alone distinguishes the action at bar from the single legal decision cited by defendant Kelly[7] relating to *respondeat superior, Stengel v. Belcher,* 522 F.2d 438 (6th Cir.1975). In *Stengel,* the Sixth Circuit affirmed the District Court's finding that an off-duty police officer had acted within the scope of his employment when he interceded in a fight between other patrons in a restaurant, on the grounds that the regulations of the City of Columbus Police Department *required* the individual defendant to carry a firearm while off-duty and to intervene in the altercation. Kelly's actions of May 22, 1989, arising from an incident of an indisputably personal nature, were in no way similarly compelled or sanctioned by the statutes, regulations, or directives governing his conduct as a correction officer.

Insofar as defendant Kelly cites any source authorizing his actions on May 22, 1989, he does so in support of his claim for indemnification (discussed further *infra* at 204) wherein he relies on Criminal Procedure Law § 2.20(3). That subsection provides as follows:

> A peace officer, whether or not acting pursuant to his special duties, *who lawfully exercises any of the powers conferred upon him pursuant to this section,* shall be deemed to be acting within the scope of his public employment for purposes of defense and indemnification rights and benefits that he may be otherwise entitled to under the provisions of section fifty-k of the general municipal law ...

Crim.Proc.L § 2.20(3) (emphasis added).

 Although, defendant Kelly does not indicate which of his powers under the Criminal Procedure Law he was purporting to exercise in the underlying incident, he may refer to the power "to use physical force and deadly physical force in making an arrest or preventing an escape pursuant to section 35.30 of the penal law." Crim.Proc.L. § 2.20(1)(b). Neither plaintiff nor defendant Kelly, however, has adduced any evidence establishing that Kelly was effecting an arrest or attempting to effect an arrest of plaintiff Michael Longin. Moreover, defendant Kelly does not contend that he was required to use force against Longin to prevent him from escaping. *See* Defendant Kelly's 3(g) Statement, ¶ 6.[8] In any event, such a contention would be unavailing, because

---

6. Similarly, plaintiffs' allegation that Kelly represented himself as a police officer does not disturb our conclusion that he acted outside of the scope of his employment on May 22, 1989. It is undisputed that defendant Kelly so identified himself only after plaintiff Michael Longin asked him if he was a police officer. Longin Dep. at 74. Under the foregoing authorities, an identification solicited by the plaintiff clearly cannot serve to transform a personal dispute into official action. *Turk, supra; Stavitz, supra.*

7. As noted, defendant Kelly joins in plaintiffs' opposition to the City's motion for summary judgment.

8. Plaintiffs appear to suggest that a factual issue exists as to whether defendant Kelly ordered plaintiff Michael Longin to remain in the park until the Long Beach police arrived. This assertion is contradicted both by defendant Kelly's testimony that he asked Longin and his friends to leave the park, Kelly Dep. at 98–99, and by Longin's acknowledgement that Kelly asked him to leave the park. Longin Dep. at 71. That Longin also testified, contradictorily, that Kelly asked him to leave the park, *id.,* at 77–78, is of no consequence because a plaintiff clearly may not manufacture a disputed issue of fact based upon contradictions in his own testimony. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) (party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment); *Miller v. Int'l. Tel. & Tel. Corp.,* 755 F.2d 20, 24 (2d Cir.) (party cannot create genuine issue of material fact with affidavit contradicting prior deposition testimony), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). In any event, neither party testified that Kelly used physical force, the action that is the subject of this litigation, in order to prevent Longin's escape from the park.

Penal Law § 35.30 clearly does not sanction the use of deadly physical force to prevent the escape of a person who the officer believes may have been guilty of underage consumption of alcohol.[9] Accordingly, we grant the City's motion for summary judgment with respect to plaintiffs' claims against the City under the theory of *respondeat superior*.

### Defendant Kelly's Cross–Claim for Indemnification and Representation Pursuant to Municipal Law § 50–k

■ Defendant Kelly cross moves against the City, seeking indemnification and representation by the City pursuant to Municipal Law § 50–k(3) and 50–k(2) respectively. The law is clear, and counsel for defendant Kelly conceded at oral argument, that the City is obliged to indemnify and represent an employee only in instances where litigation arises as a result of actions taken by that employee within the scope of his or her employment. General Municipal Law 50–k(3) (City will indemnify only where "the employee was acting within the scope of his public employment"); *Kelly v. City of New York*, 692 F.Supp. 303, 308 (S.D.N.Y.1988). In light of our finding, *supra* at 201–04, that defendant Kelly was not acting within the scope of his employment in shooting plaintiff Michael Longin on May 22, 1989, defendant Kelly's cross-claims for representation and indemnification are dismissed.

### Conclusion

The motion of the City for summary judgment dismissing plaintiffs' claims against the City under federal and state law, and defendant Kelly's cross-claims against the City under state law, is granted.

SO ORDERED.

---

**9.** Pursuant to Penal Law 35.30(1), a peace officer is authorized to use deadly physical force to prevent an escape only when the officer reasonably believes that:

 (a) The offense committed by such person was: (i) a felony or an attempt to commit a felony involving the use or attempted use or threatened imminent use of physical force against a person; or
 (ii) kidnapping, arson, escape in the first degree, burglary in the first degree or any attempt to commit such a crime; or

 (b) The offense committed or attempted by such person was a felony and that, in the course of resisting arrest therefor or attempting to escape from custody, such person is armed with a firearm or deadly weapon; or
 (c) Regardless of the particular offense which is the subject of the arrest or attempted escape, the use of deadly physical force is necessary to defend the police officer or peace officer or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force.