**Mignon MINGO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. CV 01–1839(ADS).

United States District Court, E.D. New York.

Aug. 5, 2003.

Judy Moses, Esq., Central Islip, NY, Percy M. Samuel, Esq., Elmont, NY, for Plaintiff.

Roslynn R. Mauskopf, United State Attorney Eastern District of New York by Susan Riley, Assistant United States Attorney, Central Islip, NY, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This is an action brought under the provisions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2674 *et seq.*, to recover damages for personal injuries sustained by the plaintiff Mignon Mingo ("Mingo" or the "plaintiff").

### I. BACKGROUND

The following facts are undisputed. On September 22, 1997, the plaintiff was shot and seriously injured at her home by one Edward M. Babb ("Babb"), a special agent of the United States Immigration and Naturalization Service ("INS"). After shooting the plaintiff three times, Babb shot and killed himself. On April 6, 1999, the plaintiff was declared a victim of a crime. On September 6, 2000, the plaintiff filed a standard form 95 claim for damages or injury with the INS. On October 2, 2000, a notice of denial and a report to sue letter was sent to the plaintiff.

On March 26, 2001, the plaintiff commenced this action by the filing of a complaint which sets forth four causes of action. The first cause of action is based on the "negligent entrustment of dangerous weapons." The second is for "vicarious liability for an employee's action." The third and fourth causes of action are for pain and suffering. In effect, the first and second causes of action are the only substantive causes alleged.

The primary issues in this case concern the defendant's contentions, supported by a motion for summary judgment, that it is entitled to a dismissal of the complaint on the grounds that, (1) the plaintiff failed to exhaust the administrative remedies required under the FTCA because she did not file her administrative claim with the INS within the two-year limitation period set forth in 28 U.S.C. § 2401(b); and (2) Babb, a federal employee, was not acting within the scope of his employment, as is required by 28 U.S.C. § 1346(b). In response, the plaintiff argues that she did not know the existence and cause of her injuries until she was declared a victim of a crime and that the INS was negligent in issuing guns to Babb. The Court addressed these two material factual issues at a hearing held on July 2, 2003 and July 28, 2003.

### II. THE HEARING—FINDINGS OF FACT

At the hearing, Mingo testified that she had a troubled relationship with her fiance Edward Babb who lived in the basement apartment of her house. Mingo described Babb as possessive and jealous and stated that he wanted her to account for all of her time away from him. Mingo stated that Babb had a gun issued by the INS and carried it with him at all times. Mingo conceded that she never reported any of Babb's threats to the INS.

Mingo testified that on the day of the shooting, Babb was not on duty with the INS either that day or in the evening. During direct examination, she described the September 22, 1997 shooting, as follows:

THE WITNESS: And we were—we had discussed not being together. And he was not very happy about it. And that evening we had gotten back home from counselling by the pastor of our church. And when we got home I was eating—finished eating supper and was getting ready to go and visit a friend. And on my way going, I realized he was following me. And I turned back and came home. And he came home after me and wanted to talk. And we started the discussion. And I asked him why

was he following me. And he didn't really respond. He was—

Q What happened next?

A He said to me he wanted to know where I was going. And I said, I told you where I was going. And I said we just came from counselling and our minister told us what we should do, and you are doing something different from what we were told. And I was going to call the pastor to let him know what happened. Because he advised us if anything happened that neither of us was happy. To call him. He said, yes, he agreed I should call. And as I turned away to go and get the phone, I asked him to pick up the other phone so he can hear what I am saying and both of us could be on the phone at the same time. *And as I reached the phone and I turned around, he was right there in front of me with his weapon and he shot me.*

    \*     \*     \*     \*     \*     \*

Q And it is at this point when you go in to use the telephone in your bedroom that Mr. Babb appears in front of you with a gun; is that correct?

A Yes.

    \*     \*     \*     \*     \*     \*

Q Where was Mr. Babb when he fired the shots?

A In front of me, close range.

Tr. at 54–55, 82, 84.\* (emphasis supplied).

When asked whether she lost consciousness, Mingo stated "somewhat, yes" and recalled *the detectives talking to her to* "keep me alert." At Mercy Hospital, her first recollection was following her surgery. One week after Mingo was discharged from Mercy Hospital, she "passed out" from severe pain and was readmitted

to the hospital for another two weeks. At the present time, she is assisted by neighbors, friends and her son and daughter, but can no longer afford a nurse or an aide. Mingo testified that one of the three bullets still remains in her body.

One week after Ms. Mingo was discharged from Mercy Hospital, she "passed out" from severe pain and was re-admitted to the hospital for another two weeks. When she was discharged from the hospital she stayed with her sister for two months with a nurse and an aide. She needed the services of the aide for almost a year. At the present time she is assisted by neighbors, friends and her son and daughter, but no longer can afford a nurse or an aide. She had physical therapy for almost a year. Ms. Mingo owns a car and has a New York State driver's license but does not drive by herself because she is dizzy and lightheaded most of the time. Ms. Mingo stated that she was lightheaded and dizzy the morning of the day she testified at the hearing.

On cross-examination, it was again brought out that at the time of the shooting Mingo was face-to-face with Babb and knew what happened.

Q You were face to face with Babb on September 22nd, 1997, when he shot you; is that correct?

A Yes.

Q And the first shot hit your arm; is that correct?

A Yes.

Q And which arm was hit in that first shot?

A My left.

Q And you were shot twice after that; is that correct?

A Yes.

\* Tr. refers to Hearing Transcript pages.

Q You only saw one gun; is that correct?

A Yes.

Q Now, you didn't lose consciousness when Babb shot you; is that correct?

A Yes.

Q And you, in fact, saw Babb shoot himself; is that correct?

A Yes.

Q And, in fact, you saw him shoot himself twice; is that correct?

A Yes.

Q And as you sit here today, you remember the shooting, don't you, as you described it here today?

A Yes.

Q *And you had known at the time you were shot on September 22nd—on September 22nd, 1997, you knew that Edward Babb shot you, didn't you?*

A *Yes.*

Q And you knew that he shot himself; is that correct?

A Yes.

Tr. at 74–75 (emphasis added).

It was also brought out during cross-examination that after the shooting, when she was on the floor and still conscious, she told her son Jermaine that Edward Babb had shot her and told him to call the police, which he did. Police arrived at the scene fairly quickly, and Mingo told the police that Babb had shot her.

Q And you knew on September 22nd, 1997 when Babb shot you, you knew you were hurt, physically injured by having been shot by Babb, you knew that, correct?

A Yes.

Tr. at 77.

At the hearing, the plaintiff produced two medical witnesses on the issue of timeliness. The first witness was Dr. Magdi S. Sourdour, a specialist in internal medicine, pulmonary disease and critical care, who was the plaintiff's treating doctor with regard to her pulmonary condition. Dr. Sourdour first saw the plaintiff at Mercy Hospital on September 23, 1997, the day after the shooting. She complained to him that she was unable to breathe properly as a result of being shot in the left side of her chest and that she suffered continuous pain as a result of chest surgery. Dr. Sourdour treated the plaintiff intermittently through the years to the present time and testified that he treated only her pulmonary condition. He prescribed a number of medications for her including painkillers and sleeping pills furnished "at her request." Dr. Sourdour noted that she complained of abdominal pain, back pain and depression throughout her treatment and referred Mingo to a psychiatrist, a psychologist, and a chiropractor for various other complaints.

Significantly, Dr. Sourdour testified that the plaintiff did not sustain or suffer from a brain injury and had no damage to the brain or amnesia as a result of being shot. Also of importance, he stated that she remembered what happened on September 22, 1997; namely, she told him she was shot by her boyfriend. In addition, Dr. Sourdour testified that the plaintiff was lucid, alert and oriented at all times.

Q And at all times Mrs. Mingo has been lucid, correct?

A Yes, ma'am.

Q And that would be at all times since November 3, 1997 up to the last time you saw her, on July 14, 2003. Correct?

A Yes, ma'am.

Q She has been alert and she has been oriented. Isn't that correct?

A Yes.

\*      \*      \*      \*      \*      \*

Q Miss Mingo is very articulate, correct?

A Yes.

Q And she is very well groomed, correct?

THE COURT: Very what?

MS. RILEY: Well groomed.

A Yes.

Tr. at 128–130.

During the years Dr. Sourdour treated Mingo, he said that she has been upset "about the fact that her boyfriend shot her." Dr. Sourdour testified that she was competent to make decisions regarding her treatment and that at no time did he ever diagnose her as being mentally incompetent. In fact, he testified that, despite her medications and depression, Mingo was competent.

A She is completely (sic) competent, knows the time, the place, and the address and the family members and the treatment she's encountered.

Tr. at 137.

The Court notes that counsel for the plaintiff did not ask Dr. Sourdour any questions regarding his opinion as to her competency as of the time of the shooting on September 22, 1997, the day before he first treated her.

The final witness for the plaintiff was Dr. Yosef Brody, a clinical and forensic psychologist, who was retained to evaluate the plaintiff in connection with this lawsuit. His only meeting with the plaintiff was on July 24, 2003, four days prior to his appearance in court. Based on the visit and a review of her medical records, Dr. Brody diagnosed the plaintiff as suffering from chronic post-traumatic stress disorder and chronic major depressive disorder. Dr. Brody said that her symptoms include flashbacks, nightmares, insomnia, loss of appetite and difficulty concentrating and that her conditions were related to the shooting. Psychological tests revealed that the plaintiff suffers from some cognitive dysfunction and sporadic memory problems. However, notwithstanding these conditions, Mingo's memory of the September 22, 1997 incident was intact.

Q All right. You testified that Mrs. Mingo suffers from posttraumatic stress disorder. Correct?

A Yes.

Q But despite that diagnosis, she remembers what happened to her on September 22, 1997, doesn't she?

A Yes, she does.

Memory of the incident is not a requirement of the diagnosis.

Q So her memory of the incident is in tact (sic). Isn't that your testimony?

A Yes, it appears to be.

Q And you have also testified that she suffers from major depressive disorder. Correct?

A That's correct.

Q But that major depressive disorder also doesn't impair her recollection of the events of September 22, 1997, does it?

A No. Her memory is distinct and her difficulties in memory are distinct from either of these two psychiatric diagnoses.

Tr. at 176–177.

Dr. Brody testified that the plaintiff described the September 22, 1997 shooting incident.

Q Now, she also talked to you about what had happened to her, correct?

A She did.

Q She told you, did she not, that she had been shot? Correct?

A That is correct.

Q  And she told you she had been shot by a Mr. Babb, an Edward Babb. Correct?

A  That's correct.

Q  And she described him to you, didn't she, as her boyfriend?  Correct?

A  That is right.

Q  And she told you that he had shot her several times on September 22, 1997.  Correct?

A  I believe it was twice.  But that she was shot by this man, correct.

Q  But she told you that.  Correct?

A  Yes.

Tr. at 170.

Also, Dr. Brody reviewed a police report with regard to the September 22, 1997 shooting incident and stated that immediately after the shooting, the plaintiff was able to fully described what had occurred to her.

A  She told me she went to go pick up the phone.  I don't know if she actually picked up the phone.

Q  All right.  And then she told you he shot her, correct?

A  Yes.

Q  Face to face.  Correct?

A  That's my understanding.  Yes.

Q  In her bedroom, correct?

A  That's my understanding.  Yes.

Q  And that's what she told the police September 26, 2997, to your knowledge. Correct?

A  Yes.

\*   \*   \*   \*   \*   \*

Q  So her memory of the incident is intact.  Isn't that your testimony?

A  Yes, it appears to be.

Tr. at 176.

Notably, Dr. Brody related only her current condition and did not evaluate the plaintiff's psychological or emotional condition as of 1997.

## III.  DISCUSSION

### A.  Standard for a Hearing in Connection with a Motion for Summary Judgment

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c);  *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When a movant demonstrates through competent evidence that no material facts are genuinely in dispute, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed. R.Civ.P. 56(e)).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);  *Vann v. City of New York*, 72 F.3d 1040, 1048–49 (2d Cir.1995).

In accordance with the spirit of Rule 56, a movant may also request a hearing on any material triable issues, which, if resolved, would lead to summary judgment. *In re Bennett Funding Group, Inc.*, 336 F.3d 94 (2d Cir.2003);  *Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1066 (2d Cir.1995);  *Physicians Reciprocal Insurers v. Cuomo*, 129 F.R.D. 469 n. 3 (S.D.N.Y.1990).  After a review of the motion papers, the Court determined that a hearing was required on two issues

of material fact (1) whether the plaintiff timely exhausted her administrative remedies; and (2) whether the shooting occurred within the scope of employment of Edward Babb with the INS.

### B. Is This Case Barred by the Federal Tort Claims Act Statute of Limitations?

■■■ The exclusive remedy for torts committed by federal employees in the course of their duties is the Federal Tort Claims Act. However, unless a plaintiff has first timely exhausted her administrative remedies, the Court has no subject matter jurisdiction over the FTCA claim. *See McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). "The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." Section 2401(b) contains a two-year limitation period for claims brought under the FTCA, providing that a "tort claim against the United states shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). The FTCA administrative exhaustion rule is a jurisdictional requirement which cannot be waived. *See Millares v. United States*, 137 F.3d 715, 720 (2d Cir.1998); *Morales v. United States*, 38 F.3d 659, 660 (2d Cir.1994); *Keene Corp. v. United States*, 700 F.2d 836, 841 (2d Cir.) *cert. den.* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Because the FTCA constitutes a waiver of the sovereign immunity of the United States, the statutory requirements for pursuing a claim must be adhered to strictly. *Id.* at 841; *Schunk v. United States of America*, 783 F.Supp. 72, 81 (E.D.N.Y.1992).

■■■ Federal law determines when a claim accrues for purposes of the two-year limitations period. *Kossick v. United*

*States*, 330 F.2d 933, 935 (2d Cir.), *cert. den.*, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964). Accrual of an FTCA claim generally begins at the time the injury or harm is inflicted. The statute of limitations begins to run "when the plaintiff knows both the existence and cause of his injury." *United States v. Kubrick*, 444 U.S. 111, 120, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir.1998). However, in exceptional situations, "courts have made a 'diligence-discovery' exception to this rule, which delays accrual for any plaintiff who is 'blamelessly ignorant of the existence or cause of his injury.'" *Gittens v. The City of New York*, No. 97 Civ. 5794, 1999 WL 688455, at *2 (S.D.N.Y. Aug. 30, 1999) (quoting *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir.1982)).

■■■ This exception is applied only (1) in medical malpractice cases or other cases in which the injury was "inherently unknowable" at the time of the occurrence, or (2) where the government intentionally conceals the acts giving rise to the plaintiff's claims. *See Kronisch*, 150 F.3d at 121; *Barrett*, 689 F.2d at 327. Under the diligence-discovery exception, "accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause," *Kronisch*, 150 F.3d at 121, not when the plaintiff realizes he has a legal action, *see Kubrick*, 444 U.S. at 122–25, 100 S.Ct. 352.

■■■ "Mental incompetency generally does not toll the statute of limitations of the Federal Torts Claims Act," *Kelly v. United States*, 554 F.Supp. 1001, 1005 (E.D.N.Y.1983) (citations omitted), unless the mental condition bears on the plaintiff's ability to understand the nature and cause of her injuries. *See Zeidler v. United States*, 601 F.2d 527 (10th Cir.1979). In addition, "[d]iscovery of the 'critical facts'

of injury and causation is not an exacting requirement, but requires only

> knowledge of, or knowledge that could lead to, the basic facts of the injury, *i.e.*, knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it.... [A] plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice."

*Id.* (quoting *Guccione v. United States*, 670 F.Supp. 527, 536 (S.D.N.Y.1987)). The requirements of Section 2401 are strictly construed, and a plaintiff bears the burden of pleading and proving compliance with Section 2401(b). *Wang v. United States*, 61 Fed.Appx. 757, 759, 2003 WL 1785891, at *1 (2d Cir.2003) (citing *Johnson v. The Smithsonian Institution*, 189 F.3d 180, 189 (2d Cir.1999)).

In this case, the evidence is clear that the plaintiff knew both of the existence and the cause of her injuries at the very time of the shooting on September 22, 1997. The plaintiff testified several times that she knew that she had been shot three times by Babb who stood directly in front of her during the shooting. She did not fully lose consciousness at any time and was able to tell the police exactly what had occurred, namely, that she had been shot by Babb. As such, the Court finds that the plaintiff had actual knowledge of the facts of her injuries and its cause and of the person who inflicted these injuries. Accordingly, the plaintiff's potential FTCA claim arose on September 22, 1997, when the injury and harm were inflicted.

■ Nor is the "diligence discovery" exception applicable. The injury was not "inherently unknowable" as it would be in some medical malpractice cases. In addition, the government did not conceal the acts giving rise to her injury by Babb. Furthermore, it is undisputed that the first notice of claim to the INS was on September 6, 2000, almost three years after the occurrence. Accordingly, the Court finds that the plaintiff Mignon Mingo failed to timely present her tort claim with the INS within two years after the occurrence, as a matter of law. Thus, the defendant's motion for summary judgment dismissing the complaint is granted.

To complete the record, the Court will next address the defendant's second contention that Edward Babb was not acting within the scope of his employment when he shot the plaintiff on September 22, 1997.

## C. Was Babb Acting Within the Scope of his Employment When He Shot the Plaintiff?

■ The waiver of sovereign immunity contained in the FTCA extends only to "the negligent or wrongful act or omission of any employee of the Government *acting within the scope of his office or employment* ...." 28 U.S.C. § 1346(b) (emphasis added).

■ To determine whether Babb was acting within the scope of his employment, the Court must apply the law of New York State, the place where the shooting occurred. *See* 28 U.S.C. § 1346(b). "Under New York law, the doctrine of respondeat superior renders an employer vicariously liable for a tort committed by an employee while acting within the scope of his employment." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979)). However, where an employee commits a tort for personal mo-

tives unrelated to the furtherance of the employer's business, the employer is not liable for the tort committed. *Id.; see also Davis v. City of New York*, 226 A.D.2d 271, 641 N.Y.S.2d 275 (1st Dep't 1996) ("an employee's actions are not within the scope of employment unless the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business. Thus, where an employee's conduct is brought on by a matter wholly personal in nature, the source of which is not job related, his actions cannot be said to fall within the scope of his employment.").

■ To determine whether a particular action falls within the scope of employment, the New York state courts consider five factors: (1) the connection between the time, place and occasion for the act; (2) the history of the relationship between the employer and employee as spelled out in actual practice; (3) whether the act is one commonly done by such an employee; (4) the extent of departure from normal methods of performance; and (5) and whether the specific act was one that the employer could reasonably have anticipated. *Haybeck v. Prodigy Services Co.*, 944 F.Supp. 326, 329 (S.D.N.Y.1996). While all five factors are considered, New York courts generally place greater emphasis on the fifth factor, namely, whether the acts involved in this case could reasonably have been anticipated by his employer. *See Essig v. United States*, 675 F.Supp. 84, 87 (E.D.N.Y.1987).

The undisputed facts reveal that all five factors point to the clear determination that the act done by Babb was not in the course of his employment. In particular, the INS could not have reasonably anticipated that he would commit a criminal act. This is a classic case of an intervening criminal act not within the reasonable anticipation of the employer. The plaintiff points to the alleged fact that Babb received two guns from the INS instead of one. Assuming that fact to be true, it would in no way impose any liability on the INS for this shooting which was done for purely personal reasons and could not have been reasonably anticipated by the INS.

■ Under well-established New York law, the use of an officer's off-duty weapon "is not, by itself, sufficient to establish that the officer's wrongdoing was undertaken within the scope of his employment." *Longin v. Kelly*, 875 F.Supp. 196, 201 (S.D.N.Y.1995) (citing *Turk v. McCarthy*, 661 F.Supp. 1526 (E.D.N.Y.1987)); *Kelly v. City of New York*, 692 F.Supp. 303 (S.D.N.Y.1988) (holding that because an off-duty officer's use of his weapon against fellow health club members occurred as a result of a personal dispute, his actions did not fall within the scope of his employment). These cases show that it is not the source of the weapon that is used that determines employer liability, but whether the employee is acting in furtherance of the business or interests of the employer in using the weapon. In this case, Babb shot the plaintiff resulting from a purely personal dispute. Babb was off duty when he shot the plaintiff and he had just returned home from pre-marital counseling with the plaintiff's minister. Clearly, Babb was not acting in furtherance of his duties as an INS special agent, just as he was not acting within the scope of his employment with INS when he shot the plaintiff three times and shot and killed himself.

The record is devoid of any evidence that the INS knew about the plaintiff's personal problems with Babb. Nor did the INS receive any notice about a propensity of Babb to be violent or use his weapon in such a manner. In addition, there is no

evidence that a failure to properly train Babb was in any way a factor in this aberrational criminal act. Accordingly, the Court finds that, as a matter of law, this shooting was not in the course of Babb's employment.

## IV. CONCLUSION

Based on the foregoing, it is hereby

ORDERED, that the defendant's motion for summary judgment dismissing the complaint in its entirety is GRANTED; and it is further

ORDERED, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**